Aaron Hoig *et al.*

*v.*

Adrian College *et al.*

1. Conveyance—*does not take effect without delivery.* Where a deed executed by a person in his lifetime is not delivered to the grantee, and the condition upon which it was to be delivered by the custodian has never happened, no title will pass by it.

2. Where a party executed a deed for land as a donation, and left the same with a person, not to be delivered until signed and acknowledged by his wife, and until the grantee should execute and have ready for delivery a mortgage, as it was called, securing to the grantor and his wife a life estate in the premises, and after the grantor's death the custodian placed the deed on record without authority, the wife never having signed and acknowledged the same, and the mortgage not having been delivered, it was *held*, on bill by the heirs of the grantor, that the deed should be set aside, as a cloud upon their title.

3. Gift—*deed for land as a gift may be withdrawn at any time before delivery.* A voluntary conveyance without consideration, intended as a donation of land, placed in the hands of a custodian, may be withdrawn by the grantor at any time before delivery, and, if left for delivery upon certain conditions, the custodian is not the judge of whether the conditions have been performed, and he has no right to deliver the same until the donor is satisfied.

4. Same—*specific performance.* It is not sufficient that a party may have agreed to deliver a deed, executed by him to the donee for land, to perfect a mere donation. On refusal, a court of equity will not compel a specific performance, and, until actually delivered, the donor may change his purpose, no matter in whose hands the deed may be placed, and on his death the authority of the custodian ceases.

Appeal from the Circuit Court of Warren county; the Hon. Arthur A. Smith, Judge, presiding.

On the 23d day of October, 1872, Alimer Hoig, since deceased, with one Soll L. Thrap, an agent for Adrian College, a corporation existing under the laws of the State of Michigan, went to the office of the witness Dryden to have papers prepared in relation to the conveyance to Adrian college of certain real estate situated in this State, and then owned by decedent. It was the intention of the parties to have the land conveyed to the college with a reservation of a life estate to the grantor and his wife. Various modes of effecting the object in view were discussed. It was finally agreed, a deed for the property should be executed, and the college should give back what the parties called a " mortgage," to be executed by the college, to secure the life estate. Accordingly, a deed and mortgage were prepared by Dryden. It appears Mr. Hoig signed it at the time, but his wife was to come in on the next day, and sign and acknowledge it with him. It was agreed the deed was to remain in the hands of Dryden until the " mortgage " should be executed by the college, in conformity with the laws of Michigan, and when returned the deed and " mortgage " were both to be placed on record in the proper office. Whether the " mortgage " was, in fact, executed on behalf of the college, is one of the controverted facts in the case, upon which the evidence is conflicting. A life lease was prepared, duly signed by the officers of the college, and forwarded, with the recommendation of counsel it would better secure the life estate. Mrs. Hoig declined to sign the deed. This fact was communicated to the agent of the college, and he was asked if the deed would be accepted without the wife's signature to it. His reply was, it would be, but it does not appear that answer was ever made known to Mr. Hoig. It was suggested, if Mrs. Hoig persisted in her refusal to sign the deed, it would not be necessary to secure to her a life estate, but to the grantor alone; and if that was satisfactory to him, the lease which had been previously prepared should be returned, that the college might make a new one for his special benefit. That was never done, nor does it appear the proposition was ever disclosed to Mr. Hoig, who was, at that time, confined to his house by sickness, which ter-

minated in his death.   He died on the 5th day of January, 1873, and the deed was placed on record by Dryden, without any special order from any one, on the 8th day of the same month.   Neither the " mortgage" nor any life lease was recorded with it.   Nothing was paid for the land.   It was understood, if conveyed, it was to be a donation to the college.

This bill was filed by the heirs of the grantor, to set aside the deed as a cloud upon the title to the land that had descended to them.   The circuit court found the equities with defendants, and dismissed the bill.   Complainants bring the cause to this court on appeal.

Messrs. PORTER & MOSHER, for the appellants.

Messrs. STEWART & PHELPS, for the appellees.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

One position taken is fatal to the present decree, and indeed, any decree in favor of defendants.   It is, the deed which was executed by Alimer Hoig, in his lifetime, was never delivered to the grantee named, nor did the condition upon which it was to be delivered ever happen; and, therefore, no title to the land ever passed to the defendant College.   When the deed was prepared and signed by Hoig it was left with Dryden, that it might be signed and acknowledged by his wife on the next day, with the grantor.   It was expressly agreed the deed should not be delivered until signed and acknowledged by the wife, nor until what the parties called a " mortgage " to secure to the grantors a life estate in the lands, had been executed ready for delivery.   It was to be executed in conformity with the laws of the State of Michigan, where "Adrian College," to which the grant was to be made, was situated.   On the question whether any " mortgage " securing a life estate to the grantor and his wife, was ever made by the officers of the college, the testimony is contradictory; but we think the decided preponderance of the evidence is, no such " mortgage " was executed.   It is certain no such instrument was shown to

the grantor, nor was he advised it was ready for him. It was his privilege to judge for himself whether the terms upon which he was willing to deliver the deed to his property as a donation, had been performed. The scrivener in whose custody the deed was left was not invested with any discretion in regard to it. He had no authority to deliver it until the grantor was satisfied it should be. Being a voluntary conveyance, without consideration, the grantor was at liberty at any time to withdraw the deed from the possession of the custodian, and the grantee could have no just cause to complain. The grantor was under no legal obligation to complete the donation.

At the time of the trial of this cause the original of the " mortgage " had been mislaid and could not be found. Had it been produced it would have settled, definitely, the dispute whether it was ever executed by the college. The officers of that institution are most positive in their recollection it was; but Dryden, to whom all concede it was returned, is of opinion it was never signed and acknowledged. That is his best recollection. Written evidence in the case shows the officers of the college must have been mistaken. At the time they say the " mortgage " was signed and acknowledged, a " life lease " was prepared and signed by the officers of the college, and perhaps acknowledged under the forms of the law, which they were advised would better secure to the grantors a life estate in the premises. All these papers, with a letter from their legal adviser, were sent to Dryden. Before these papers were received, however, it had been ascertained Mrs. Hoig would not sign the deed, and at the request of Mr. Hoig, Dryden afterwards wrote to the agent of the college, to learn whether the deed would be accepted without her signature to it. His reply, written on the 29th of November, 1872, was, that it would be; but it is added, if she preferred retaining her dower rather than a life estate in the property after the grantor's death, the college would prefer to secure to him alone a life estate, and if this proposition was acceptable to Mr. Hoig, the lease was to be returned, that one for his special benefit might be prepared.

In the same letter the agent speaks of the "life lease" as having been executed, but not one word was said about the mortgage. It was under the date of November 16, 1872, that Dryden had written to the agent acknowledging the receipt of the mortgage, lease and letter of counsel, and in which he informed him of the refusal of Mrs. Hoig to join in the deed, and of Mr. Hoig's positive instructions to hold the deed until the mortgage should be returned, and of his request to know whether the deed would be accepted unless the wife joined in the execution. It must be the "mortgage" was returned to Dryden with the other papers, not signed or acknowledged. This theory is consistent with all the facts and circumstances proven. It accords with the recollection of Dryden, and is undoubtedly the truth. If it is not so, his letter of the 16th of November is without meaning and is unintelligible. An explanation of the testimony of the officers of the college may be made consistently with the utmost fairness. They had not the original papers before them when they gave their testimony, and their recollection was at fault. A "life lease" was executed on the occasion they refer to, and from the correspondence that passed and the acts of the parties, we must believe that was all.

After the letter of the 16th of November was written, Dryden never saw Mr. Hoig in relation to this matter. Of this he is positive, and other testimony shows conclusively he was not out of his house after the 9th day of that month. Whether a "life lease" to him alone would have been satisfactory was never known. He made no election to adopt such a mode of securing to himself a life estate in the property he contemplated donating to the college. The very last instruction he gave to Dryden was "to hold the deed" until the "mortgage," which he had stipulated should be given for his security, should be returned. That was never done, and the condition upon which the donor was willing to part with his property was never performed in his lifetime.

As we have seen, the land intended to be granted was to be a donation to the college, and hence no equities arise in favor

of the proposed donee, as would prevail in favor of a purchaser for value. The evidence is, the donor was, at the time this transaction took place, an old man, frail in body and mind, and had been subject to spells of insanity for many years, and was accustomed to take opium in large quantities. With him insanity was an hereditary disease. Frequently he had made violent assaults on members of his family, and one daughter, for fear of her life, had to reside out of the family. It is shown he had inflicted upon her, and others of the household, severe injuries. On the question of his insanity, the evidence establishes that fact beyond any doubt. That he had lucid intervals of greater or less duration is also true. Without entering upon a discussion of that branch of the case, it may be gravely doubted whether he had sufficient mental capacity to make a contract of any kind at the date of this transaction.

As a condition precedent to any donation of his homestead to the college, he insisted a life estate should be secured to himself and wife. He rejected the proposition to reserve a life estate in the property in the deed itself, but in lieu of that most secure provision, he was willing to accept what the parties called a "mortgage" in the sum of $100, conditioned the college would not disturb the grantor or his wife during the natural life of either of them.. On condition broken the mortgage might be foreclosed for the sum secured, and that was all the security he was to have for his life estate in a valuable property.

But, whether he was competent to contract or not, the deed was never delivered in the lifetime of the donor, and hence no title to the property passed to the college. It is not sufficient he may have agreed to deliver the deed, to perfect the donation. On refusal a court of equity would not compel a specific performance. Until it was actually delivered to the donee, the *locus penitentia* existed, no matter in whose hands the deed was. Whatever authority the custodian may have had, it ceased with the death of the donor. No delivery could be rightfully made after his death. He had not seen fit, in his

lifetime, to donate his property to the college, and no one had any authority, after his death, to deliver a deed that would pass the title and cut off the inheritance of his legal heirs. There is no pretense the deed was placed in the hands of Dryden to take effect upon the death of the donor, or that he had authority from him to deliver it after his death. The utmost that is claimed is, the deed was placed in the hands of Dryden to be delivered when the college should deliver to the donor a " mortgage " to secure a life estate to himself and wife in the property. That was never done; at least the evidence does not show that it was.

This view being conclusive of the whole case, we have not deemed it necessary to consider other points made in the argument.

The decree will be reversed, and the cause remanded with directions to the court to decree in favor of complainants, in accordance with the prayer of their bill.

*Decree reversed.*